24 C.C.P.A. (Patents)

**In re SIBLEY.**

**Patent Appeal No. 3789.**

Court of Customs and Patent Appeals.
April 5, 1937.

BLAND, Associate Judge, dissenting.

Williams, Rich & Morse, of New York City (Henry D. Williams and Giles S. Rich, both of New York City, and Albert H. Kirchner, of Washington, D. C., of counsel), for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

Appellant brings to us for review a decision of the Board of Appeals of the United States Patent Office affirming the decision of an Examiner denying the patentability of all claims, numbered 1 to 20, inclusive, of an application for patent on "Coating Composition and Process of Preparing Same."

Claims 1, 7, and 20 are selected as illustrative of the subject matter. They read:

"1. A coating composition containing a drying oil having incorporated therein a positive oxidation catalyst and a controller of oxidation thereof comprising a reaction product of a ketone and an amine or a derivative thereof.

"7. A coating composition containing a drying oil having incorporated therein an inhibitor of oxidation thereof comprising a reaction product of diacetone alcohol and aniline.

"20. The improvement in the manufacture of coating compositions which comprises mixing the composition containing a drying oil with a positive oxidation catalyst and a controller of oxidation thereof comprising a reaction product of an aliphatic ketone and an aromatic primary amine free from secondary amino substituents."

Ten of the twenty claims on appeal are for the composition of matter and ten for the process of manufacture. All of the claims except 7, 14, 15, and 16 specify a positive oxidation catalyst and those include a drying oil which it seems acts in substantially the same manner as a positive oxidation catalyst. All the claims specify a controller of oxidation (or what is conceded to be an equivalent thereof), defined as an inhibitor of oxidation, and this element constitutes the crucial limitation involved in the controversy. The brief for appellant states: "The controller of oxidation of claim 1 is a reaction product of (1) a ketone and (2) an amine or a derivative thereof. This is a class of substances never before used for the purposes of the invention as claimed, and the specification names 17 substances of the class of ketones, any one of which may be combined with any one of 15 other substances of the class of amines to produce the reaction product desired. The ketone in another claim is defined as an aliphatic ketone, and the amine in another claim is defined as an aromatic amine, and specifically the ketone is set forth as diacetone alcohol and the aromatic primary amine as aniline."

The Examiner said: "In the application appealed by the applicant, there are six claims to wit, 1, 2, 3, 8, 9 and 10 broad as to the amine; they are not restricted to the primary amine. As to the other claims they are more restricted, embracing only the primary amines. * * *"

In its decision the Board eliminated one British patent which has been cited as a reference by the Examiner. So, the case comes to us with the following patents and publications cited as prior art: Ostwald et al. (Brit.), 10,361, April 20, 1911; Powell, 1,672,657, June 5, 1928; ter Horst, 1,807,355, May 26, 1931; ter Horst, 1,822,548, September 8, 1931; Merkle, 1,829,999, November 3, 1931; Yohe, 1,909,329, May 16, 1933; Soc. Chem. Ind. Japan, vol. 39 (1930) pp. 129, 130; J.Ind. & Eng.Chem., pp. 691–693.

The following general statement as to the grounds of rejection is quoted from the brief of the Solicitor for the Patent Office: "It was held that the patent to Merkle discloses a composition of the general type claimed by appellant, which includes a drying oil, an oxidation catalyst, and then an anti-oxidant. It was admitted by the Patent Office tribunals that the specific reaction product employed by appellant as an anti-oxidant was not mentioned in the Merkle patent. However, the specific material employed by appellant as an anti-oxidant in the combination as claimed has herebefore been used to prevent undesired oxidation in rubber. On this state of the art the tribunals of the Patent Office ruled that the subject-matter of the appealed claims was without patentable merit over the prior art. * * *"

The brief on behalf of appellant says: "The case at bar presents a simple question. Given the use of substances in another art, which substances are substantially the same as applicant's substances, but it being conceded that so far as this particular art is concerned the use of applicant's substances as claimed is new, did it involve invention to discover that these old substances possess new properties not theretofore known?"

Of the patents cited as references both of those to ter Horst are entitled "Treatment of Rubber." They were relied upon to show the specific anti-oxidant in rubber, it being the theory, as expressed by the Examiner, "that the regulating and control of oxidation in rubber is the same as in oil, soaps and coating compositions containing drying oils."

The patent to Merkle is entitled "Coating Composition and Process of Preparing Same" and states that it more particularly applies to drying oil coating compositions and methods of preventing premature oxidation of the compositions. It discloses a pro-oxidant and an anti-oxidant, but concededly his anti-oxidant is different from that of appellant. Merkle recites a number of anti-oxidants, but does not name that of appellant. So, it appears that the Merkle patent was primarily cited to show that the general com-

bination described in the claims at issue is old, and the patent to Ostwald et al. to show a solution of the problem with another anti-oxidant "many years prior" to Merkle, but the Ostwald et al. anti-oxidant is also conceded to be different from that of appellant. Ostwald teaches that "Lacquers, drying oils, and similar substances and products therefrom, such as linoleum and the like behave in a similar manner. as india-rubber products. They change under the influence of light and air; for instance linoleum and oil cloth break; colours, varnishes and lacquers crack and peel off; oil and spirit varnishes shrink and also peal off. This takes place particularly with products containing certain hard resins, for instance shellac and sandarac."

The Board says of the Ostwald et al. reference: "The British patent to Ostwald et al. also lists, as amenable to the same general treatment, rubber, along with drying oils, resins and varnishes. There are a number of statements in this patent which lead one to the conclusion that substances which might be useful for controlling oxidation of one of the materials mentioned might also be useful with the others. Ostwald et al. do not mention a great number of suitable materials."

Of the Yohe patent, which relates to rubber treatment and is entitled "Age Resister," the Board says: "The patent to Yohe discloses the direct reaction of ketonic bodies with amines and is pertinent to the substitution of amines, rather than their salts, in the materials employed by ter Horst."

The patent to Powell is entitled "Soap Stabilization." The Examiner states, in substance, that it and the publication, "Soc. Chem.Ind.Japan," are cumulative as to the analogy of the problem of preventing and also controlling oxidation in oils (or oil material as soap) and rubber. Further allusion to this article will be made by us later in this opinion.

The purpose of the "J.Ind. & Eng. Chem." citation is shown by the following excerpt from the decision of the Board: "The Smith article in Industrial and Engineering Chemistry, which article deals with inhibiting agents generally useful with unsaturated organic compounds, makes reference to the fact that substances having an ethenoid linkage are subject to oxidation and that this oxidation can be controlled by the use of a suitable antioxidant. In discussing the general subject, specific reference is made to oil, fats, fatty acids, soaps, acrolein, rubber and petroleum. The article goes on to discuss a number of specific inhibitors and makes the statement that it is logical to assume that the substances which inhibit in one case should do likewise in another."

Appellant, by affidavits, to which no reference was made in the decisions of the respective tribunals below, seems to have established (partly by his own researches and partly through experiments made by researchers for the American Paint & Varnish Manufacturers Association at his instigation) that at least twenty-two reaction products, composed of combinations of different chemicals, found to be satisfactory and efficient as antioxidants in the vulcanization of rubber, are useless as anti-oxidants in the production of appellant's product. No question is made as to the verity or accuracy of this evidence, and we are impressed with the argument that where so many agents taught to be good as anti-oxidants, often referred to in the record as anti-agers, for rubber are useless for appellant's purposes, it is going somewhat too far to hold that the teachings relative to the rubber vulcanization art and the soap art, even when coupled with the somewhat fugitive expressions of different of the references as to the similarity of reaction of some similar agents in the paint and varnish art, precludes the idea of invention on the part of appellant.

It is our view that the most potent reference cited is the article from the Journal of the Society of Chemical Industry of Japan, listed supra, as "Soc. Chem. Ind. Japan, Vol. 39 (1930) pp. 129–30." Except for one example by the Ostwald et al. patent teaching the mixing of thickened linseed oil and aniline (said to be a well known accelerator of rubber vulcanization) for the making of linoleum, the Japanese article seems to be the only reference which definitely teaches the treatment of drying oil and rubber stock with the same materials. The article (published in 1930) after saying that "The antioxydants extended recently their use in rubber industry," recites that its authors, Yoshio Tanaka and Mitsuo Nakamura, seemingly of the Department of

Applied Chemistry, Faculty of Engineering, Tokyo Imperial University, had examined the action of "several of these antioxydants, * * * upon the oxidation of drying oil," linseed oil being chosen as the drying oil. Nine anti-oxidants of rubber are listed as having been used in the experiments, viz., "(1) V. G. B."; "(2) Neozone Standard"; "(3) Baygal 'C'"; "(4) Neozone C"; "(5) Baygal 'D'"; "(6) Neozone A"; "(7) Neozone D"; "(8) Albasan," and "(9) Baygal 'A.'" None of these, as we understand it, is the same in chemical composition as appellant's oxidation controller consisting of a ketone and an amine in some one of their respective forms as defined in the claims.

It has been said already that the Examiner cited the Japanese publication as cumulative. The Board says of it:

"The Japanese publication also discusses the use of anti-oxidants with drying oil and mentions a number found to be suitable, among them several previously known to be anti-oxidants of rubber. The publication makes the general statement that:

"'Antioxydants of rubber have all antioxygenic action toward linseed oil, although their activities are varied according to their kinds.'"

Appellant argues with respect to the substances used in the experiments by the Japanese that the several neozones are all in the same general class and are well known as rubber anti-aging materials; that he is informed that "Baygal 'A'" is the same as "Neozone A" and "Baygal 'C'" is "Neozone D"; that in any event it is reasonable to assume that the neozones and baygals are closely related substances; that of the other two, "V. G. B." is an acetaldehyde-aniline condensate made by the United States Rubber Company, and is a well known anti-ager for rubber, and from these facts deduces that "it is reasonable to assume that these nine examples are of one general class and two specific instances, or three in all." Further, when commenting on the excerpt from the article quoted above and the Board's remark thereon, the brief says: "This is a statement based upon tests of at most six substantially different substances, and refers only to these substances. It summarizes the results of the tests made by the authors and is not a general statement applicable to all anti-

oxidants of rubber. As quoted in the opinion of the Board of Appeals, * * * it would seem to be a general statement, but it is merely a statement that in these particular researches a limited number of examples were found to be anti-oxidants more or less useful in the treatment of linseed oil. If given the connotation adopted by the Board, the quoted statement is untrue."

It is noted that the Japanese article states "The rubber-antioxydants on the market can now be reckoned by about twenty and so." Granting that each of the nine agents experimented with in the drying oil art by the authors of the article was a separate substance, it remains true that these constituted only a minority of all the rubber-vulcanization agents stated to be "on the market," and we have no evidence of experiments by them with the majority. As a matter of fact, the record already outlined indicates that there are many more than twenty rubber anti-oxidants, appellant himself having directly or indirectly found at least twenty-two to be useless for his purpose.

Appellant cites numerous authorities in support of his contention that catalytic action is unpredictable and that chemical discoveries are empirical and are patentable even though arrived at by a process of exclusion through research. Among such authorities are Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; United Chromium, Inc., v. International Silver Co. (D.C.) 53 F.(2d) 390 (a case in which the patent was finally declared void but upon the ground that it was issued to the wrong party and not upon any ground here pertinent), with its cited cases; Toledo Rex Spray Co. v. California Spray Chemical Co. (C.C.A.) 268 F. 201; Celluloid Mfg. Co. v. American Zylonite Co. et al. (C.C.) 35 F. 301; King et al. v. Anderson et al. (C.C.) 90 F. 500, and Diversey Corporation v. Mertz (D.C.) 13 F.Supp. 410.

All the cases so cited were infringement proceedings and, as of course, related to patents which had been granted, not to applications for patents. In considering the grant of an application, the Patent Office tribunals are not required always to take as broad a view as the courts sometimes take in upholding the validity of a patent once granted. Never-

theless, in chemical cases in particular, some experimentation is practically always necessary and the difficulty lies in drawing the line of demarcation between mere skill and invention. Upon the record in this case we feel constrained to hold that invention was present. Any doubt which may exist should be resolved in favor of applicant.

It seems to be taken for granted that all the claims stand or fall together; hence there is no occasion to analyze them or differentiate between them.

The decision of the Board of Appeals affirming the decision of the Examiner is reversed.

Reversed.

BLAND, Associate Judge, dissents.

HATFIELD, Associate Judge, did not participate in the decision of this case.