### SALES AFFILIATES, Inc., v. HUTZLER BROS. CO.

### SAME v. CARTER PRODUCTS, Inc.

#### Nos. 2496, 2935.

District Court, D. Maryland.

Jan. 29, 1947.

Morgan, Finnegan & Durham, of New York City, and Piper, Watkins, Avirett & Egerton, of Baltimore, Md., for plaintiff.

Campbell, Brumbaugh & Free, of New York City, Venable, Baetjer & Howard, of Baltimore, Md., Worthington Campbell and Leland L. Chapman, both of New York City, and Raymond Clark, of Baltimore, Md., for defendants.

COLEMAN, District Judge.

This is a patent infringement suit. The plaintiff, Sales Affiliates, Inc., a New York corporation, is the assignee of United States patent No. 2352524, granted June 27, 1944, on application of June 20, 1938, to Ralph L. Evans and Everett G. McDonough, for a depilatory, that is, for an agent for the removal of hair from the human body.

Schering Corporation, a New Jersey company engaged in the business of manufacturing and selling cosmetic prepara-

tions, is the exclusive licensee of the plaintiff under this patent for making and selling a depilatory known as IMRA. One of the defendants, Hutzler Brothers Company, a Maryland corporation, sells a depilatory known as SLEEK, manufactured by Elizabeth Arden, Inc., a New York corporation. Plaintiff first sued Hutzler Brothers Company, claiming infringement of the patent. Shortly thereafter, a similar suit was brought by plaintiff against Carter Products, Inc., a Maryland corporation, which makes and sells a depilatory known as NAIR. The Schering Corporation, at the commencement of the trial of the present suit, petitioned for leave to intervene, but this right was denied because in contravention of the express provisions of the license agreement between that corporation and the plaintiff; and also because of the absence of any showing that the Schering Corporation's rights under that agreement would not be adequately protected, even though it was denied the right to intervene at this time.

The two suits were consolidated and tried together. Both defendants have asserted the usual defenses of (1) noninfringement, and (2) invalidity of the patent. The patent embraces 17 claims. However, only six are in suit, namely, Nos. 2, 6, 11, 12, 13 and 17, and counsel for defendants virtually conceded infringement of all of them in the course of the hearing, but deny their validity.

The novelty claimed for the patent is that the compound which it embraces is the first chemical depilatory to combine all of the following characteristics: (1) absence of objectionable odor; (2) nonirritating and harmless to the human skin; and (3) quick and completely effective in its depilating results. The alleged invention may best be understood by quoting the following from the specifications of the patent itself: "The practice of removing hair from the skin of certain parts of the body has been followed for many years. Various methods such as shaving, abrading, plucking, electrolysis, etc., have been resorted to, but the method most popular for removal of hair from the arms, armpits, and legs, particularly of women, employs preparations whose chemical action on the hair fibre sufficiently weakens it so that the hair above the skin surface may be wiped or washed off in a few minutes after applying. These preparations are known as depilatories and are sold in liquid, paste or powder form. The latter is made into a paste by addition of sufficient water in order to be used.

"These chemical preparations contain as their effective ingredients, one or more of the alkali or alkaline-earth salts of hydrogen sulfide. Such salts have a tendency to hydrolyze and have an appreciable vapor pressure due to the hydrogen sulfide gas. Their use in any product imparts to it the disagreeable odor that is reminiscent of rotten eggs. All attempts to mask the odor result in failure. The use of heavy perfume and gaseous absorbents, such as clays and charcoals, only serve to minimize the objectionable odor. If the alkalinity is increased, the odor is reduced but the possible danger due to irritation of the skin is increased. If the sulfide is oxidized to an odorless form, its odor is destroyed, but also the effectiveness of the product is lost.

"Another disadvantage that accompanies the use of these sulfides is that when present in a paste they impart to it an unattractive greenish cast, probably due to the formation of insoluble colored metallic sulfides.

"Besides the disgusting odor that accompanies the use of hydrogen sulfide salts is the fact that the liberated or free hydrogen sulfide that escapes into the room is toxic to breathe and although in such dilution it is probably not dangerous, nevertheless, together with its nauseating odor it has caused certain individuals to become ill.

"Also the escape of this hydrogen sulfide gas into the home causes black coating of most metal utensils, such, for example, as silverware or jewelry. Also, it is retained and imparts its loathsome odor to fabrics and rugs, etc.

"The object of our invention is the production of depilating preparations which have none of these disadvantages. There are no objectionable odors, a white paste is produced, a delicate perfume may be used

and silverware, or other metals are not tarnished if brought in contact with the preparation. Depilating preparations made in accordance with our invention will remove hair quickly (within 5 to 10 minutes), depending on coarseness of the hair, safely (without injury to the skin), and effectively (no stubble left).

\* \* \* \* \* \*

"A depilatory to achieve its purpose must destroy hair without damaging or even irritating the outermost layers of the skin. The difficulty of accomplishing this object appears almost insurmountable when one realizes the close chemical relation that exists between the outer skin (epidermis) and hair. Further, in a commercially successful preparation the depilatory must remove even the most resistant and coarse hair and yet not injure or irritate the most delicate and sensitive skin. Further, the depilation must take place in a very short time, not to exceed about thirty minutes, not only because the user will be annoyed the longer the time but also because with longer contacts there is a tendency to do skin damage because of (a) penetration into and action on the skin of the depilatory solution and (b) evaporation of water from a paste depilatory to form a crust that abrades the tenderized skin on removal."

The further specifications of the patent are quite detailed and lengthy. Summarized, the alleged primary basic distinction between the depilatory covered by the patent and depilatories previously known, lies in the use of mercaptans instead of sulfides. Mercaptans may be broadly described as organic compounds having sulfide atoms. They are divided into two broad classes which are commonly spoken of as (1) simple mercaptans and (2) substituted mercaptans. A simple mercaptan is an organic substance stemming from an alcohol, in which the hydroxyl group has been replaced by one hydrogen sulphide group (HS). A substituted mercaptan is a simple mercaptan in which one or more of the hydrogen atoms have been replaced by some other atom or groups of atoms. Substituted mercaptans are again divisible into (1) those of the non-polar group which

in solution do not ionize, that is, do not, when put in solution, break down into electrically charged particles, both positive and negative, known as ions; and (2) those of the polar group which do ionize in solution. This latter group includes both (a) those of the acid-acting kind, and (b) those of the basic-acting kind. It is clear from the Evans and McDonough specifications that all of the aforementioned types of substituted mercaptans are intended to be included.

Of the claims in suit No. 2 is the narrowest and No. 6 the broadest. We quote them both:

"2. A depilatory for use in removing human hair from the body, comprising a creamy preparation containing a substantial amount of a creamy non-depilating vehicle carrying thioglycollic acid, and an excess of an alkaline reacting material, said creamy preparation being adapted to be spread upon the human skin and around the hair, the amount of thioglycollic acid being sufficient to render the hair removable after contact therewith within a short time and without irritation to the skin, and the alkaline reacting material being present to an amount sufficient to give the preparation a pH value between about 10 and 12.5."

"6. A depilatory for use in removing human hair from the body, comprising a creamy preparation containing a substantial amount of a creamy non-depilating vehicle carrying a mercaptan, and an excess of an alkaline reacting material, said creamy preparation being adapted to be spread upon the human skin and around the hair, the amount of mercaptan being sufficient to render the hair removable after contact therewith within a short time and without irritation to the skin, and the alkaline reacting material being present in an amount sufficient to give the preparation a pH value between 9 and about 12.5."

Breaking down claim 2, the narrowest of the claims in suit, into its component parts, we find that it calls for the six following things: (1) A substantial amount of a creamy non-depilating vehicle; (2) carrying thioglycollic acid (which is also known as mercapto-acetic acid); (3) an excess of

an alkaline reacting material; (4) this creamy preparation being adapted for spreading upon the human skin and around the hair; (5) the amount of thioglycollic acid being sufficient to render the hair removable after contact therewith within a short time and without irritation to the skin; and (6) the alkaline reacting material being present in an amount sufficient to give the preparation a pH value between about 10 and 12.5.

It will be seen that the compound called for by the claim embraces two depilating ingredients: (1) the mercaptan, namely, thioglycollic acid, and (2) an alkaline reacting material such as lime, which is the material especially recommended in the specifications. In addition to these basic ingredients there is the paste-forming ingredient which may be any one of many non reactive, insoluble powders, preferably, as the specifications state, precipitated chalk, magnesium oxide, clays, talcs or pyrophyllites. Lastly, there is included a perfume material consisting of 1% or less of light compounded floral odors.

If we separate the component parts of claim 6 as we have done those of claim 2 they will be found to be the same as those of claim 2 except that (1) no particular mercaptan is specified, and (2) the lower limit of the pH value (pH being, in chemistry, the measure of alkalinity, and pH 7 representing the neutral point between acid and alkaline) is reduced to 9 from "about 10".

Shorn of technical phraseology, hair is the outgrowth of the epidermis or the outer layer of the skin, containing neither blood vessels nor nerves, and is composed of a horny substance known as keratin. The function of the mercaptan is to weaken the keratin, and then it becomes the function of the other depilating ingredient, namely, the alkaline reacting material, to remove the hair which has thus been weakened. In depilatories where sulfides, instead of mercaptans are used, the sulfides perform the same function as mercaptans.

#### The Question of Validity.

##### (a)—Context of the claims.

Since, as has been stated, the defendants rely primarily upon their contention that the patent is invalid and indeed virtually concede that, if valid, the claims in suit have been infringed by their products, it is appropriate to proceed at once to a consideration of the question of the patent's validity.

Defendants raise the question of validity on a number of grounds. We will take these grounds up separately and will first consider the contention that the claims in suit are invalid because indefinite and merely functional in terms, and, therefore, fail to meet the requirements of R.S. Sec. 4888, 35 U.S.C.A. § 33.

R.S. Sec. 4888 provides that the description of the invention or discovery "and of the manner and process of making, constructing, compounding, and using it," shall be "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery. * * *"

Defendants assert that in order to meet these statutory requirements in the patent in suit, the critical formulation must be recited in the claims, and that they are not met by providing merely for "the alkaline reacting material being present in an amount sufficient to give the preparation a pH value between about 10 and 12.5", as claim 2 recites, and as all of the other five claims likewise recite, except for some specified variation in the lower or upper pH range. It is claimed that this leaves too much for experimentation. Do other ingredients affect what is "sufficient" in a particular case? Does the amount that is "sufficient" change with the pH value of the particular "alkaline reacting material" used? No particular "material" is specified. Does the amount that is "sufficient" change with the particular mercaptan employed? Only claim 2 of all of the claims in suit specifies a particular mercaptan, namely, thioglycollic acid, but even in that claim the *amount* is not specified.

Similarly, the defendants emphasize that all of the six claims in suit recite, in sub-

stance, that the amount of mercaptan will "render the hair removable" or will "effect removal of the hair", after contact within "a short time", and "without irritation to the skin". What is "a short time"? How much or how little irritation is permissible? How much mercaptan will remove hair within "a short time"?

By stating the aforegoing questions and finding them, as defendants assert, unanswered by the words employed in the several claims, defendants argue that, therefore, the claims are invalid on their face, since they call merely for *results* anticipated, in purely functional language,— that they are too indefinite and do not define the metes and bounds of the alleged invention. In support of this contention, defendants quote the language of various decisions to the effect that no inventor may compel independent experimentation by others in order to ascertain the limits of his claims; that he may not broaden his claims by describing the product in terms of the function. The rule thus stated is basic in our patent law. The claims measure the invention. Paper Bag Patent Case (Continental Paper Bag Co. v. Eastern Paper Bag Co.), 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232. Therefore, we accept it as applicable to the present case. However, it is equally axiomatic that each and every claim of a patent is to be read and interpreted in the light of the specifications set forth in the patent; and that while a material deficiency in the language of a claim may not be supplied merely by reference to supporting provisions in the specifications, it is, nevertheless, true that, depending upon the particular character of the alleged invention, there may be certain things set forth in the specifications that need not be embraced in the claims themselves but which, when read with the claims, make the latter adequate under the statutory requirements. Although specifications may not enlarge a claim, they may explain it. See General Electric Co. v. Wabash Appliance Corporation, supra; Schriber-Schroth Co. v.

Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; United Carbon Co. v. Binney & Smith Co., supra.

Applying the rule as thus stated to the claims in suit for the purpose of determining whether they are too indefinite or functional in their terms, we conclude that they are not. In every chemical patent of the general character of the one in suit, in the very nature of things certain leeway must be permitted with respect to the amount of a particular ingredient where, as here, the use of any one of various ingredients well known in the art and embraced in the generic term employed in the claim to cover them, is permissible. As above pointed out, defendants urge that with respect to the alkaline reacting material, it is not enough to say that the amount of that material shall be "sufficient" to give the preparation the specified pH value. However, the amount is, in fact, specifically defined by a formula in the specifications. It is stated that "it is desirable that the concentration of the alkaline material in solution be not greater than twice the equivalent concentration of the mercaptan (and the acid groups it contains). For example, in one liter of solution, if with 0.2 mole of mercapto-acetic acid is used 0.5 mole of sodium hydroxide (1.25 equivalents) good results are obtained, yet a smaller amount of mercapto-acetic (0.1 mole) with the same amount (0.5 mole) or (2.5 equivalents) of sodium hydroxide concentration gives skin irritation and damage."

Next, with respect to the complaint that no particular alkaline reacting material is specified, this is likewise lacking in merit, because it must be borne in mind that all such materials, their properties and characteristics are well known in the art, and, besides, the specifications are replete with an enumeration of these materials, and with an analysis of their respective attributes, advantages and disadvantages if employed in the formula. At the end of the specifications, one particular illustrative formula is set forth, giving the precise type and quantities of every ingredient embraced in it, following which is this statement: "While we have described examples of our invention and have outlined advantages of

our invention over the art, we do not wish to limit ourselves to the exact materials or preparations outlined in the proceeding. A variety of materials of like or similar properties may be used in lieu of those described herein and the preparations may be widely varied, without departing from the scope of our invention or the spirit of the appended claims."

As we have already indicated, the same argument is made against the recital in the claims with respect to the required amount of mercaptan necessary to accomplish complete depilation in a short time, without irritation to the skin; also, that there is a fatal defect in the claims in not defining what is meant by "a short time". But, likewise, we feel that the argument of indefiniteness with respect to these points is no more tenable than with respect to the alkaline reacting material, because we find that the specifications not only supply the so-called gaps but we believe that they are gaps which are permissible in the claims in dealing with chemical formulas of the type here involved.

As respects the requisite amount of mercaptan, the specifications state: "We have found that when the concentration of the mercaptan is less than 0.1 mole per liter of solution it is necessary for us to increase the alkalinity to such a high concentration in order to effect hair destruction that skin damage and irritation results. Further, we have found that the mercaptan need not exceed 1.5 moles per liter. * * * The most desirable results are achieved when the solution contains about 0.5 mole of the mercaptan per liter of solution."

Insofar as the failure to state in the claims what is meant by the phrase "short time" when used in connection with the depilating process, again we believe that it is not a fatal defect to require reference to the specifications in order to ascertain the meaning of this phrase. The specifications state that "Depilating preparations made in accordance with our invention will remove hair quickly (within 5 to 10 minutes), depending on the coarseness of the hair, safely (without injury to the skin), and effectively (no stubble left)." It would be carrying the requirements of definiteness to an absurd point, we think, to say that

with respect to a chemical formula of the type and for the use specified, the results claimed for that use are accomplished within a maximum number of minutes in every application. We know of no precedent for such requirement.

[9] The second major argument of defendants that the claims in suit are invalid because too indefinite, is based upon the facts that the claims (except claim 2) embrace, by their broad language, whole classes of mercaptans in which fall an unlimited number of types not covered by the specifications of the patent.

The specifications analyze and discuss two types of mercaptans, the first being described by the experts who testified for both the plaintiff and defendants by the term "simple mercaptans", and the second, by the term "substituted mercaptans", both of which we have already defined. The specifications state that "Simple mercaptans are of no value commercially since they possess a nauseating odor, far greater, in most instances, then hydrogen sulfide." Thus, simple mercaptans are written out of the patent as not being a permissible ingredient of the prescribed formula.

As for the other type of mercaptans, namely, substituted mercaptans, several are specifically referred to, and, as we have already seen, one of them, belonging to the acid-acting groups and described in the specifications as being particularly effective for the desired purpose, is included in the illustrative formula given at the end of the specifications, namely, mercapto-acetic acid (thioglycollic acid).

Turning to the six claims in suit, we may divide them into two groups, in the first of which fall the broadest claims, Nos. 6 and 17, and in the second, the narrowest, Nos. 2, 11, 12 and 13. Claim 6 uses the broad term "mercaptan" without more description. Claim 17 uses the term "salt of mercaptan" without further description. Thus, both of these claims, by reason of their broad scope in this respect (the term "salt of mercaptan" embracing salt of a simple mercaptan) do, by their very language, include those mercaptans which, by the express statement in the specifications above quoted, are declared to be ineffectual as ingredients for the pro-

duction of the depilatory as contemplated by the patent. Accordingly, we find that these two claims, Nos. 6 and 17, must be held to be invalid because too broad and inconsistent with the specifications.

Turning to the remaining four claims which we have grouped together, i.e., claims 2, 11, 12 and 13, we need not repeat what we have already said to indicate that claim No. 2 is not defective, as are claims 6 and 17, with respect to its reference to mercaptans, because it goes to the other extreme and specifies only one mercaptan, namely, thioglycollic acid. Claims 11, 12 and 13, each call for "a substituted mercaptan". This is attacked by defendants on the ground that the specifications of the patent refer to only three specific "substituted mercaptans", viz., beta-mercaptoethanol, thioglycollic acid (mercapto-acetic) and beta-aminoethylmercaptan; and that except for the additional reference to two mercaptans, designated as simple ones, i.e., ethyl mercaptan, and benzyl mercaptan, (which are stated to be unsatisfactory), the specifications fail to name any other mercaptans, and refer merely to "groups", such as "carboxyl groups", "amino groups", "hydroxy group", and "polar" and "nonpolar" groups. From this it is argued that only by experimentation can it be determined what types of mercaptans will work. It is to be noted that defendants' chemist, contrary to plaintiff's chemist, put benzyl mercaptan in the class of simple mercaptans.

■■■ It is true, as has already been explained, that R.S. Sec. 4888 requires an inventor to inform the public of the limits of his monopoly, and that his claims must measure the invention. But again, we believe that the degree of precision required in a claim, with respect to complete enumeration of all the various ingredients contemplated by a chemical formula, must depend somewhat upon the extent to which the properties of those ingredients are already known to the chemist. The chemists who testified on both sides in the present case stated that, at the present time, the field of mercaptans is still unexplored to such an extent that they could not state with exactness how many mercaptans were actually known, but they were in agreement that the division of mercaptans into the two groups of (1) simple mercaptans, and (2) substituted mercaptans, was proper. The specifications of the patent here in suit expressly exclude the former from being appropriate ingredients under the specified formulas. We do not believe, in view of the present state of chemistry with respect to mercaptans, that the rule as to definiteness is violated by permitting the patentees in the present case to embrace in a claim under the broad class terminology of "substituted mercaptans", all mercaptans which they believe to be operative, especially since the specifications analyze and explain why certain of those mercaptans are believed to be best adapted to accomplish the desired result, and even though, as the evidence disclosed, some of them were not so adapted.

We now turn to a consideration of another ground on which defendants argue that the claims in suit are invalid, namely, that the mere control of the pH value of a depilatory, through the purported discovery of an optimum of alkalinity, does not constitute patentable invention, and that invention cannot be predicated upon any other ground.

The specifications of the patent recite that "preferably the pH value should not be less than pH 9.0 and no greater than pH 12.5. Below pH 9.0 the depilating action is too slow, and as the pH increased beyond pH 12.5 the skin damage becomes increasingly more pronounced and the skin irritation more severe." In short, this is an expression in chemical terms of the patentees' conclusion as to how high the alkalinity of their formula might be raised in order to insure quick and complete depilation while, at the same time, not being so high as to cause irritation to the human skin. Thus, of the six claims in suit, the four which, as just stated, are sufficiently definite in their terminology, namely, claims 2, 11, 12 and 13, specify a pH value not greater than 12.5 and not less than 9 in the case of claims 11, 12 and 13, and not less than 10 in the case of claim 2. But defendants assert that the purported discovery of an optimum of alkalinity does not constitute patentable invention, for the reason that the prior art clearly disclosed that a depilatory should not irritate the skin of the user and that a solution

having an upper pH value of about 12.5 will not irritate the skin of the average person; that there is express recognition by the patentees of prior knowledge of the danger of irritation in a depilatory by their statement in the specifications; that whether or not an alkaline solution irritates the skin depends on numerous factors, among which are (a) the sensitiveness of the user's skin, and (b) the length of time the skin is exposed to the solution; and the fact that the patentees actually presented claims in their application which called for an upper pH value of 13 is tantamount to an admission that they believed there was nothing critical about a pH value of 12.5 as compared to 13.

Assuming for the moment that the discovery of an optimum of alkalinity may not, per se, constitute patentable invention because of prior art disclosures, it does not follow that these four claims are for this reason invalid, since each of them embraces a combination of ingredients, and the question is, therefore, whether the patentees were the first to discover and put this combination to successful use, even though all of the ingredients may have previously been known to the art, and even though some of them had been previously used in similar, provided not in the same or equivalent combination, *unless* the patentees and, therefore, their assignees, the plaintiff, are not permitted to claim that novelty in the combination rests upon anything but control of the upper pH value.

Defendants claim that the plaintiff is so restricted in the present suit, namely, that it is estopped from taking any other position. In support of this argument, defendants rely upon the history of the patentees' application through the Patent Office and the issuance of the patent, which, as defendants assert, indicates that all four of the claims of the patent now under consideration were granted by the Patent Office Examiner solely upon a mistaken view that there was novelty over the prior art only in defining an optimum of alkalinity, and that the patentees, having accepted this position of the Patent Office Examiner and embodied it in their amended claims, the plaintiff is now estopped from adopting any other position.

In order to determine whether or not this argument of defendants' is sound, it is necessary to review the action of the Patent Office Examiner. The application for the present patent was filed June 20, 1938, although, as stated in the patent, this application was a continuation, in part, of patentees' application, serial No. 167934, which had been filed October 8, 1937, but thereafter abandoned. The progress of the later application through the Patent Office was slow and protracted due, to some extent, to the fact that it was placed in interference with an application by one Karel Bohemen, a Dutch subject, which had been filed on July 24, 1937, and which corresponded to a French patent, No. 824,804, issued to one William Fletcher. This proceeding, however, was terminated by settlement between the parties, Bohemen withdrawing in favor of Evans & McDonough in consideration of his getting a license under their patent from the present plaintiff.

Omitting the major portion of the Patent Office chronology as disclosed by the file wrapper with respect to the application for the present patent, because believed to be immaterial to the precise issue now before us, we turn to the letter dated December 13, 1943, which the Patent Office Examiner addressed to the patentee, and upon which defendants primarily rely. This letter reads as follows:

"Responsive to amendment filed Dec. 4, 1943.

"Claims 34, 39, 40, 41, 43 and 48 to 59 are now in this application.

"—a—should be inserted after 'carrying' in line 3 of each of the newly presented claims 48 and 50 to 59 and in line 4 of claim 49.

"Claims 48, 52, 57, 58 and 59 [which became nos. 6, 10, 15, 16 and 17, respectively, of the patent] are rejected as failing to define patentability over Turley. These claims do not recite any upper limit for the pH and so will read on the extremely alkaline compositions used by Turley. In this connection it should be noted that applicants are not the first to discover the depilating action of mercaptans, for such action is taught by Turley. Applicants have only discovered that when the pH is

within a certain range (between 9 and 12.5) the preparation is a safe depilatory for human use. *Hence the omission of the upper limit of the pH is an omission of one of the essential, basic features of applicants' invention; and such omission renders the claims unpatentable over Turley.* Note that there is nothing to indicate that Turley's compositions would not be effective and relatively safe depilatories for human use if they were removed after an extremely short period of time.

"Claims 34, 39, 40 and 41 [which had been allowed July 10, 1943, and ultimately became claims 1, 2, 3 and 4, respectively, of the patent] and 43 [not previously allowed, and which became No. 5 of the patent] are deemed allowable while claims 49, to 51 and 53 to 56 will be allowable when amended as suggested above. [The amendment is the mere insertion of a preposition as above referred to.]

"A clear issue having been reached, this rejection is MADE FINAL." (Italics inserted).

Upon receipt of the aforegoing letter, patentees amended the five claims that had been rejected by the above letter, namely, claims 48, 52, 57, 58 and 59, (which became nos. 6, 10, 15, 16 and 17, respectively, of the patent) because of their failure to specify in each of them the upper limit of the pH, by inserting this specification. Thereupon, these claims were allowed. Also, the other claims with which we are not here concerned were allowed upon the minor grammatical change being made as suggested by the Examiner. As a matter of fact, this same minor change was made in all of the claims that had not previously been allowed.

In order to determine whether, as defendants assert, the plaintiff is estopped from saying that there is novelty in this combination other than such as may be embraced solely in the control of the upper pH limit, it is necessary first to analyze the contents of the aforegoing letter of the Examiner, with direct relation to what the Examiner had previously ruled with respect to other claims embraced in the patent application, and to understand the character of those claims.

It is to be noted that by his letter the Examiner rejected claims 48, 52, 57, 58 and 59, which, as already stated, ultimately became claims 6, 10, 15, 16 and 17, respectively, of the patent; and that also, he "deemed allowable" claims 34, 39, 40 and 41, which, as we have also already explained, had previously been allowed and ultimately became claims 1, 2, 3 and 4, respectively, of the patent. When originally allowed, these four claims read precisely as they did when the Examiner ruled upon them in his letter of December 13, 1943, just analyzed; and it is significant to note that all but one of them, namely, claim 34 (which, unlike all the other claims ultimately allowed, calls for one specific formula, and which became claim 1 of the patent), contained a recital of the upper pH limit. Also, claims 49, 50, 51 and 53, 54, 55 and 56, which, by the Examiner's letter were allowed upon a minor grammatical change being made, likewise contained the same pH limit and became claims 7, 8, 9, 11, 12, 13 and 14, respectively, of the patent. Also, claim 43, which became claim 5 of the patent and which, as we have seen, was first allowed by the Examiner's letter of December 13, 1943, had originally contained the same pH limit.

It will thus be seen that the Examiner, by his ruling that the omission of the upper limit of the pH from certain of the claims specified in his letter, was a fatal omission, was harmonizing his position regarding these claims with the position he had taken with respect to previously allowed claims. Defendants assert that the Examiner's letter indicates beyond question that the control of the pH value was the sine qua non of the Examiner's allowance of the claims; that the plaintiff must stand or fall upon this construction of the claims as adopted by the Examiner, with the result that the claims must be held invalid because the mere control of the upper pH value of a depilatory, whether 12.5 or any other amount, is not invention, since the prior art, particularly as disclosed by the patent to Turley, which, as defendants assert, the Examiner mistakenly supposed embraced a higher pH than 12.5, taught precisely the same control.

Conceding, as we believe must be done for reasons which we will hereinafter give in dealing specifically with the prior art patents, that the Examiner was, as defendants claim, in error with respect to his interpretation of the Turley patent in its relation to the upper pH limit, we are, nevertheless, not convinced that defendants are correct with respect to the conclusion that must follow from the Examiner's error. In the first place, it is necessary to bear in mind that we are here dealing with claims that involve a *combination* of ingredients,—that it is the *entire combination,* and not any single ingredient upon which novelty may rest,—a *combination* that, to be patentable, had to be *new* in the sense that no one had previously disclosed this *same combination* of ingredients, even though all the ingredients and their respective properties were well known in the prior art. Therefore, even if we assume that the Examiner's letter must be interpreted as though *he* considered that invention lay solely in the control of the upper pH limit, nevertheless, we do not think that the plaintiff is necessarily thereby estopped from asserting a different position. We say this because the plaintiff claims, and we believe has a right to claim, that the allowed claims comprise a *combination* not previously disclosed, and that it is not restricted to proof that novelty lies solely in one element of the combination. In other words, plaintiff is not prevented from insisting that the actual invention is in fact broader or different from what the Patent Examiner had supposed.

Our conclusion is, we believe, supported by numerous decisions. For example, Egry Register Co. v. Standard Register Co., 6 Cir., 267 F. 186, certiorari denied, 254 U. S. 642, 41 S.Ct. 14, 65 L.Ed. 453, was a case involving alleged infringement of a patent relating to autographic registers for making a plurality of shipping bills, sales slips, etc. The claims of the patent here in suit involved two elements: a feeding device and a device for facilitating the tearing off of the sheets. In rejecting the argument of the defendant that the plaintiff was estopped from claiming the benefit of the feeding device as an element of his claims, the Circuit Court of Appeals for the Sixth Circuit said, 267 F. at page 190: "We think the claims in suit, when read in connection with the specification, should be construed as claiming the invention of the patent as above defined, viz. the combination of the feeding device disclosed and the cutting-off mechanism described. Nor do we find anything in the Patent Office history which estops the patentee from claiming the benefit of the feeding device as an element of the combination of these claims. The fact that the patentee acquiesced in the rejection of claims 1 to 4, inclusive, as originally presented—which claims were confined entirely to the feeding mechanism—does not bar him from relying upon the claims now in issue, which are combination claims and include, not only the feeding mechanism, but the added element of the tearing-off mechanism. It is almost a commonplace that a new combination of elements, old in themselves, but which produce a new and useful result, amounts to invention."

International Cellucotton Products Co. v. Sterilek Co., 2 Cir., 94 F.2d 10, involved circumstances very similar to those before us. This was a suit for alleged infringement of a patent issued to one Bauer for a machine for making catamenial pads. When Bauer applied for his patent, the Examiner cited against his claims another machine. To escape this reference, Bauer thereupon limited his claims to a machine in which gauze ran at right angles to the filler web. The defendant argued that Bauer, by so limiting his claims in the Patent Office, had conceded that the prior art anticipated his claims with the sole exception of this interpolated feature. However, the Court rejected this argument of defendant (although subsequently the Bauer patent was held invalid on another ground), saying, 94 F.2d at page 12: "When an inventor consents to limit his monopoly, there is no reason in fact to impute to him the belief that his only patentable advance lies in the element so introduced. He may merely think that he still retains enough for practical purposes, and that the examiner's insistence does not justify the expense of an appeal. Nor is there any reason to impose upon him the same consequence as though he had formally so conceded; it is enough that he has freed the art except as the

claim reads, and that he has surrendered any power under the doctrine of equivalents to resume what he has given up. He has done nothing which need prevent him from insisting in support of the claim as allowed *that his invention was broader than the examiner supposed; he is not confined to the examiner's reasoning or committed to his mental processes.* United Chromium v. International Silver Co., 2 Cir., 60 F.2d 913, 915. We cannot therefore recognize the 'Johnson & Johnson machine' for any purpose whatever; it was not proved as a prior use, and until it was, the defendant might not rely upon it." (Italics inserted.) To the same effect is France Manufacturing Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605, certiorari denied 309 U.S. 657, 60 S.Ct. 471, 84 L.Ed. 1006, rehearing denied 309 U.S. 696, 60 S.Ct. 589, 84 L.Ed. 1036.

Defendants rely, as authority for estoppel, on Boynton v. Chicago Hardware Foundry Co., 77 F.2d 799, a decision of the Seventh Circuit Court of Appeals. There the patentee relied on three claims which had been rejected by the Patent Office for lack of invention, but which were later allowed after amendment. The patentee then contended that his invention lay solely in that portion of his amended claims which, as originally submitted, had been rejected by the Examiner.

The following taken from the Court's opinion discloses the precise situation in that case (77 F.2d at page 801): "The file wrapper discloses that certain claims of appellant which were rejected by the Patent Office are precisely the same as those now in issue, with the exception of certain clauses relating to the joints separating the inlays. These are indicated by our italics in foot-note 1. They were rejected for lack of invention over Snedekor, No. 457,975, which discloses molding over a rubber matrix. In that ruling appellant acquiesced by canceling original claims 2, 4, 6 and 7, and amending original claims 1, 3 and 5 by adding the italicized portions above referred to, and renumbering them respectively 1, 2 and 3. Original claims 2, 4 and 6 are precisely the same, respectively, as the present claims 1, 2 and 3 except that the latter contain the italicized portions referred to. In Morgan Envelope Company v. Albany Perforated Wrapping Paper Company, 152 U.S. 425, 14 S.Ct. 627, 629, 38 L.Ed. 500, the Court said: 'But the patentee having once presented his claim in that form, and the Patent Office having rejected it, and he having acquiesced in such rejection, he is, under the repeated decisions of this court, now estopped to claim the benefit of his rejected claim or such a construction of his present claim as would be equivalent thereto.' That principle would seem to be applicable regardless of whether the Patent Office was right or wrong in rejecting the original claim. Vanmanen v. Leonard, 6 Cir., 248 F. 939. Under those rulings we think appellant is estopped to claim invention on a rubber or flexible matrix, unless by combination with other matters contained in the amendments a new result is produced, or an old result is produced in a more facile, efficient or economical manner. We are convinced, however, that no such result was produced. The rubber or flexible matrix was not new, nor was the filling of the joints, which was merely permissive on the part of Boynton. Indeed, there seems to be no functional relationship between the two steps, and no modification of the old use of either."

In the present case, excluding claims 6 and 17 as we do, because, as already explained, they must be held invalid for indefiniteness, there remain four other claims in suit, nos. 2, 11, 12 and 13, which were allowed by the Examiner precisely as originally drawn (with the exception of a minor grammatical change), and in which the patentees here contend their invention lies. There is thus a definite distinction between the situation in the present case and that in the Boynton case, namely, there, the patentee rested his claim of invention exclusively upon the elements of his rejected claim, whereas in the present case, the plaintiff relies upon the allowed claims, *each one of which*, plaintiff contends, *discloses a new combination of which the specified pH limit is merely a part.* Similarly, such cases as Morgan Envelope Co. v. Albany Perforated Wrapper Paper Co., 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500 and Vanmanen v. Leonard, 6 Cir., 248 F. 939, cited in the Boynton case, are to be distinguished; as are also Schri-

ber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707, and I.T.S. Co. v. Essex Rubber Co., 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335. In other words, in the present case, unlike the situation in the Boynton case, plaintiff is not relying upon something upon which the Examiner ruled he could not rely, and in which ruling plaintiff acquiesced, but on the contrary plaintiff relies upon what the Examiner has allowed him and merely says that the legal effect to be given to that allowance is not to be restricted to what the Examiner may have thought was the legal effect. The principle to be applied in such a situation is akin to that which is applicable to one who disclaims part of what he has claimed in a patent. His disclaimer does not have the effect of conceding that what was disclaimed is, in fact, in the prior art. A patentee need not, at his peril, claim all that he might. See United Chromium, Inc., v. International Silver Co., 2 Cir., 60 F.2d 913, certiorari denied 288 U.S. 600, 53 S.Ct. 319, 77 L.Ed. 976.

### (b) Prior Art Disclosures

Turning now to the prior art, defendants, in attacking the validity of the patent, rely upon five prior patents and two published articles, as follows: Patent No. 1,379,855 to Joseph Donner, issued May 31, 1921; patent No. 1,899,707 to Ralph H. McKee et al., issued February 28, 1933; patent No. 1,973,-130 to Harold G. Turley et al., issued September 11, 1934; French patent issued November 18, 1937, No. 824,804 to William Fletcher; and patent No. 2,123,214 to William B. Stoddard et al., issued July 12, 1938; "Effect of Sulfides on the Alkaline Hydrolysis of Skin and Hair" by Henry B. Merrill, published September, 1924, and "A Study of Keratin" by David R. Goddard et al., published May, 1934.

Of the five patents just enumerated, we need devote little time to three of them, namely, the patents to Donner, to McKee et al., and to Stoddard et al., because the following brief analysis of each clearly indicates that none of them may properly be treated as anticipating any of the claims that are before us in the patent in suit.

The Donner patent has been in litigation, and has been held valid as an invention over the prior art because it disclosed how a liquid depilatory could be converted into a stable cream depilatory through the use of certain colloid substances. See Donner v. Walgreen Co., D.C., 44 F.2d 637; Donner v. Sheer Pharmacal Corporation, 8 Cir., 64 F.2d 217, certiorari denied 290 U.S. 658, 54 S.Ct. 73, 78 L.Ed. 570. However, in Donner the depilating agent is a sulfide, not a mercaptan, as in the patent in suit. Nor is there any suggestion that a mercaptan be used. Sulfide depilatories having the inherent bad quality of producing a very objectionable odor, skin irritation and discoloration of jewelry, etc., it was to overcome these things that Evans and McDonough resorted to the use of mercaptans. In other words, they entered the field of organic chemicals and abandoned sulfides and other inorganic compounds whose use had been commercially unsuccessful.

In the McKee patent, the depilating agent is sodium stannite, a tin salt. The same is true with respect to the Stoddard patent. The use of mercaptans is not suggested in either McKee or Stoddard. Thus, although both these patents disclose a compound that is odorless, and although they have the same range of alkalinity as does the patent in suit, the difference with respect to the depilating agent employed is a basic one. In short, both McKee and Stoddard may be considered as an improvement over Donner in that the suphur compound as prescribed by Donner had the very great drawback of (1) bad odor, and (2) dark color. These were overcome by McKee and Stoddard by the use of sodium stannite. McKee obtained his patent in 1933, Stoddard in 1938, and Stoddard represents an improvement over McKee in that Stoddard discloses a more stable stannite depilatory. Alkali stannites are very active substances, tending to decompose, which proves an obstacle to their use as depilatory agents because for this purpose it is necessary that the stannites remain undecomposed for long periods of time, in order that they may be distributed and sold to advantage in the retail trade. But Stoddard uses an alkali silicate as a stabilizer.

It will thus be seen that such advance as was made in the art by McKee and Stoddard was still in an entirely different field from that of the patent in suit.

Between the issuance of the patent to Mc-Kee and the patent to Stoddard, that is, in 1934 there was issued the patent to Turley, which represents the first depilatory patent disclosure in the same field which Evans and McDonough later entered, namely, the field of organic chemicals, through the use of mercaptans.

It is this patent to Turley upon which defendants most strongly rely in their argument that the patent in suit is invalid for anticipation. Also, as we have already explained, it was the erroneous interpretation by the Patent Office Examiner of the upper pH limit in this patent which formed the basis for defendants' argument that the plaintiff is restricted in the present suit to reliance upon that interpretation to prove invention by Evans and McDonough.

The Turley patent is designated a "process of unhairing hides or skins." There is no suggestion, express or implied, that the process relates to a cosmetic depilatory to be applied to the human skin. Furthermore, it is an immersion process. It may best be understood by quoting the following from the specifications of Turley: "This invention relates to a process of unhairing hides or skins by the use of mercaptans or those organic compounds containing or yielding a mercaptan or thiol group ( –SH) when employed with alkaline solutions such as now used for the removal of hair, fur or wool.

"The object of our invention is to complete the process of unhairing hides or skins in a shorter time than is ordinarily necessary and yet accomplish the unhairing process without creating or leaving any deleterious effect upon the hide or skin and with or without hair recovery depending upon the amount and nature of the above compounds."

On behalf of the plaintiff here it is asserted that Turley bears such a remote relation to Evans and McDonough that there is no ground for saying that Turley anticipates. In support of this position it is pointed out that in the one case it is the unhairing of dead, dried leather-making hides, and in the other, the cosmetic depilation of living, human skin. In unhairing, the hair is saved, or can be, and the epidermis is destroyed. In cosmetic depilation the hair is chemically severed at the very surface of the epidermis but the tenderest or most delicate skin is not even irritated or reddened. In unhairing, the entire flayed hide is wholly immersed in a liquid bath for several hours or even days. In cosmetic depilation, small areas of the living human skin are lightly coated during a period of from five to fifteen minutes with a fragrant cream which is wiped off as soon as the hair is severed. In unhairing, the liquid solution is always applied to and soaks through the derma from the flesh side, and usually through immersion is applied to both flesh and outer or hair sides simultaneously. In cosmetic depilation, the depilating compound is always applied on the hair side only and it never penetrates into or below the epidermal layer. In unhairing, the odor of such compounds as may be used is unimportant, as is also the optimum of alkalinity from the aspect of irritation of the skin. In a cosmetic depilatory, both pleasant odor and the optimum of alkalinity to avoid irritation are all-important.

The aforegoing comparative analysis of the inherent distinctions between the objects sought to be attained by Turley on the one hand, and by Evans and McDonough on the other, are not subject to contradiction. Furthermore, it is to be noted that nowhere in either the specifications or claims of Turley is there any mention of pH limits for the obvious reason that, as we have already pointed out, non-irritation of the hide of a dead animal is not a factor to be considered. Indeed, if recovery of the hair is not desired, a high alkalinity is not objectionable. These considerations may well have influenced the Patent Office Examiner in his view that the compounds embraced by Turley were "extremely alkaline". As a matter of fact, plaintiff's testimony shows that, in testing out several of the formulas given by Turley, a pH as high as 12.95 was reached.

In spite of these very definite differences underlying the two patents, defendants assert that the disclosure of Turley is, nevertheless, completely parallel in all of its material component parts with the disclosure in

Evans and McDonough. Turley lists by name a large number of various types of mercaptans and includes thioglycollic acid. Also, in his specifications, Turley gives nineteen separate examples or formulas to be used, with a large number of different mercaptans. None of these illustrative formulas, however, specify the use of thioglycollic acid although, as just pointed out, it is listed in the specifications, and defendants introduced at the trial through their expert, Dr. Killian, tables showing the results that had been obtained by taking three of these illustrative formulas as given in Turley and substituting thioglycollic acid for the respective unhairing agents specified therein, namely, for butylcarbitol mercaptan, cysteine hydrochloride and benzyl mercaptan.

These results, as Dr. Killian, the defendants' chemist, testified, he compared with each one of the component parts of two of the narrowest claims in suit, namely, Nos. 2 and 13. Such comparison disclosed almost complete identity. In all six instances a creamy, odorless preparation was produced which satisfactorily removed hair from the human arm without irritation within ten minutes. Also, in none of the three tests, where the substitution of thioglycollic acid was made, did the upper pH limit exceed 12.1. It reached that in one instance, was 11.9 in another, and 11.7 in the remaining instance.

Dr. Killian further testified that similar comparative tests made with two of the illustrative formulas set forth in Turley, without making any change in the prescribed mercaptans, produced similar results, except that in one instance, namely, that where cysteine hydrochloride was used, satisfactory, non-irritating depilation required from twenty to thirty minutes, instead of ten; and that in the other instance, where benzyl mercaptan was used, the resultant odor was that of a skunk.

Plaintiff introduced no evidence of a corresponding character. The most that plaintiff offered were certain specimens of the products which its analytical chemist testified resulted from following certain of the specified formulas in Turley. These products were white and odorless, but very watery, with a large amount of sediment. From this, plaintiff would have us draw the conclusion that it is not possible to produce, by following Turley, a product such as that of Evans and McDonough, at least not one with such body and stability as is requisite if it is to be successful as a depilatory for the human skin. It is true, such testimony does indicate that a depilatory produced in conformity with the requirements of Turley is a more watery, less consistent product than that of Evans and McDonough,—a slurry rather than a cream.

Relying upon their testimony which we have just analyzed, defendants assert that there is no escape from applying to the Evans and McDonough patent the well established broad patent law doctrine that a patentee is entitled to every use to which his invention is susceptible, whether such use be known or unknown to him, and that, therefore, Turley must be treated as a clear anticipation of Evans and McDonough.

As a broad, general definition of the law, the defendants have correctly stated it. See General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81; Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Potts v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327; In re Thuau, 135 F.2d 344, 30 C.C.P.A.(Patents) 979; Gilbert Spruance Co. v. Ellis-Foster Co., 3 Cir., 114 F.2d 771; In re Parker, Cust. & Pat. App., 107 F.2d 612; In re Sibley, 88 F.2d 960, 24 C.C.P.A.(Patents) 1143; Northam Warren Corporation v. D. F. Newfield Co., 2 Cir., 79 F.2d 1005, affirming per curiam, D.C., 7 F.Supp. 773; General Electric Co. v. Hoskins Mfg., 7 Cir., 224 F. 464.

The reason for this rule is that a new use of an old thing, or an old process if unchanged, cannot be patentable because the statute allows patents only for a new "art, machine, manufacture, or composition of matter * * *", even though it may take as much or more inventive genius to discover the new use than the old one. R.S. 4886, 35 U.S.C.A. § 31. The statute does not permit patenting merely a new *use* but it must be a new *art*. The word "art" means "systematic application of knowledg-

or skill in effecting a desired result." (Webster's New International Dictionary).

As was said in Ansonia Brass & Copper Co. v. Electrical Supply Co., supra, 144 U.S. at page 18, 12 S.Ct. at page 604, 36 L.Ed. 327, " * * * if an old device or process be put to a new use, which is not analogous to the old one, and the adaptation of such process to the new use is of such a character as to require the exercise of inventive skill to produce it, such new use will not be denied the merit of patentability."

Also, as was said in General Electric Co. v. Jewel Incandescent Lamp Co., supra, 326 U.S. at page 249, 66 S.Ct. at page 84: "It is not invention to perceive that the product which others had discovered had qualities they failed to detect." And likewise in Cuno Engineering Corporation v. Automatic Devices Corporation, supra, 314 U.S. at page 91, 62 S.Ct. at page 41, 86 L.Ed. 58 it was said there must be revealed "the flash of creative genius not merely the skill of the calling."

Thus, if Turley actually disclosed the use of *substituted mercaptans* in an analogous art, then the most that Evans and McDonough did was to select one of these substituted mercaptans which was best suited for their purpose of compounding a cosmetic depilatory, and this would not be invention because, while, from a group of chemical compounds taught by the prior art, the selection of one compound for use in a field closely related to the prior art field might require considerable skill and considerable laboratory experimentation, nevertheless, such selection would not rise to the dignity of invention within the meaning of the patent law. Therefore, claim no. 2 of Evans and McDonough would fall, and a fortiori so would the broader claims, nos. 11, 12 and 13.

But we are satisfied that Turley does *not* teach the use of *substituted* mercaptans, but only the use of mercaptans generally. He nowhere refers to a class of "substituted mercaptans" as distinguished from "simple mercaptans". Turley classifies mercaptans as (1) Aliphatic mercaptans, primary, secondary and tertiary, with one or more –SH groups; (2) Aliphatic mercaptans containing other groups in the molecule, such as, thioglycollic acid; (3) Alicyclic mercaptans; (4) Heterocyclic mercaptans; (5) Aralkyl mercaptans. He also states that his invention includes (6) Organic sulfides which give rise to a thiol group (— SH) by an internal rearrangement; (7) Organic sulfides in which the molecule has been so modified as to cause the liberation of a mercaptan in the presence of an alkali; (8) Compounds of those described in (1) to (6) with sodium or any other alkali or alkaline earth metal; and (9) Mixtures of any of the above.

It is true that some of the above groups taught by Turley would include substituted mercaptans; and, in fact, group (2) specifically indicates thioglycollic acid. But the invention of Evans and McDonough lies in their discovery (a) that mercaptans in general can be divided, for *depilating* purposes, into a classification different from that prescribed by Turley for unhairing, namely, into *simple mercaptans* and *substituted mercaptans,* the substituted mercaptans being further divisible into polar groups and non-polar groups; and (b) that *substituted mercaptans,* especially when in polar groups, are chemicals that can be adapted to the depilatory art where commercial requirements are totally different from those of the unhairing art, in that (1) a depilatory must be applied to the exterior surface of living and delicate skin; (2) the depilation must be rapid; (3) there must be no odor; and (4) a depilatory must be in the form of a cream which can be conveniently applied. In other words, we are satisfied that Evans and McDonough did display what, as we have seen, the Supreme Court termed "the flash of creative genius", not merely the skill of the calling, when they conceived a class of mercaptans which would not only "unhair"—because Turley taught that,—but which could be adapted to the depilatory art and thus be used on human skin where all of the very definite requirements of non-irritability, quick and thorough depilation and freedom from all objectional odor and color had not yet been successfully combined in one compound. Thus, while defendants' testimony which we have analyzed does show that certain formulas of Turley, *when read in the light of Evans and McDonough,* ac-

tually produce the result of Evans and McDonough when substituted mercaptans *suggested* by Turley are used, nevertheless, it remained for Evans and McDonough to seize upon that particular class of mercaptans which could be combined with other elements, in stipulated proportions, so as to meet the needs of the depilatory art.

What has been said of Turley in connection with anticipation is likewise true of the article by Goddard and Michaelis. They teach that certain chemicals, namely, thioglycollic acid, potassium cyanide, sodium sulfide, and sodium sulfite may be used as reducing agents of keratin in native sheep wool and chicken feathers. There is no suggestion by Goddard and Michaelis that "substituted mercaptans", as opposed to "simple mercaptans" might be effectively used in the depilatory art (in fact, Goddard and Michaelis put thioglycollic acid in the same class with the foul-smelling sulfide of Donner and with poisonous potassium cyanide); and, although the thioglycollic acid taught by Goddard and Michaelis is the same substituted mercaptan particularly employed by Evans and McDonough, yet it remained for Evans and McDonough to discover that this thioglycollic acid belonged to a group of chemicals which, upon proper formulation in combination with other chemicals, could be adapted to the demanding specifications of the depilatory art.

We believe the situation in the present case is akin to that in Gilbert Spruance Co. v. Ellis-Foster, supra, a recent decision of the Circuit Court of Appeals, Third Circuit

This suit involved alleged infringement of a reissue patent for improvement of a wood lacquer. The claim in suit was for "A varnish consisting of a solution of a glycerol ester of a resin and organic carboxylic acid selected from the group consisting of phthalic, maleic, fumaric, malic and succinic acids, incorporated with nitrocellulose." Weber, the patentee, stated that his object was to provide a composition with qualities of toughness, flexibility and extensibility, ordinary rosin ester or ester gum being a brittle substance with limited solubility. He stated that if a non-resinous organic acid, such as phthalic acid is allowed to esterify with glycerine in conjunction with rosin, a valuable product is obtained which may be termed a rosin phthalic ester of a glycerol or a rosin phthalic glyceride resin. Weber pointed out that it is well known that nitro-cellulose is incompatible with many substances and that most of the resins which dissolve in solvents for nitro-cellulose are not miscible with nitro-cellulose. He stated that he had found that the rosin phthalic glyceride resin will dissolve, mix or blend with nitro-cellulose and apparently in almost any proportion.

The defense was that Weber's patent represented no invention over the prior art. A prior patent had been issued to one Arsem for resinous condensation products, which are plastic compositions, and a process for making them. Arsem principally directed himself to the mixing of phthalic and succinic acids with glycerol. Arsem stated that the composition so formed is a glycerol ester of phthalic and succinic acids having a cyclic structure with intermediate products. He also stated that his process was suitable for the production of moulded articles, electrical insulation, and varnishes (presumably, not nitro-cellulose lacquers). Arsem stated that various substances not strictly acids but having acid properties may be employed. "Arsem points out, seemingly quite incidentally to the main disclosures of his patent, that if glycerol phthalate, Watson Smith resin, is mixed with colophony, which is simply natural resin, in proportions which he indicates, a new synthetic resin results, which is not the equivalent of a simple mixture of phthalic resin and colophony because a kind of colloidal reaction takes place to form a new product. The point, however, is that this synthetic resin is in fact the 'rosin phthalic ester of glycerol' or the 'rosin phthalic glyceride resin' of Weber's patent. It is the synthetic resin which Weber discloses will mix or blend with nitrocellulose to create a nitrocellulose lacquer suitable for sanding sealer or other coating for wood surfaces." 114 F.2d 771, 772, 773.

The defendant contended that Arsem gave Weber the resin and that all that Web-

er did was to fit it mechanically into a well established art. In holding that Weber's patent was valid (and infringed), the Court said, (114 F.2d at page 773): "We must assume that Weber's synthetic resin did come from Arsem's patent, but there are very many natural resins and many synthetic resins and out of this great number Weber had to pick and did pick the suitable resin. It is true that it was a 'hard' resin. Arsem so described it. It is equally true that the art had supposed that hard resins would give hard lacquer, but * * * the harder the resin the less the compatibility with nitrocellulose. In the light of the foregoing we thing that Weber *did demonstrate inventive genius, that he seized upon a thing which was available to all but which had been grasped by none, and was able to fit it into a new place, to create an original and useful result."* (Emphasis supplied).

The analogy between the present case and the situation as disclosed in the Gilbert Spruance Company case, just analyzed, is a strong one. It is true Weber may have been required to do more experimenting, until he discovered the rosin suitable for his particular purpose, than the experimenting that Evans and McDonough had to conduct. Nevertheless, it is true that whereas thioglycollic acid was mentioned by Turley as a mercaptan that might be used in his process, it is to be noted that not only is this mercaptan not referred to in any of the formula examples given in the specifications or in any of the claims, but also, nowhere in either specifications or claims is any reference whatsoever made to pH limits because presumably he never determined them or gave the matter any consideration, since, as already indicated, an optimum of alkalinity was of no concern to Turley, his primary concern being to reduce from a matter of days or weeks, to a matter of hours, the time required for unhairing dead animal hides.

It is true that defendants have found that if thioglycollic acid be used according to Turley's formula, there will be produced virtually the same optimum of alkalinity called for by Evans and McDonough. However, it can scarcely be said that Turley made this disclosure,—he certainly did not intend to do it, and there is nothing in the evidence in the present case that indicates the defendants or anyone else would have made this discovery other than by hindsight, that is, with the aid of what was disclosed by Evans and McDonough. In short, Evans and McDonough disclosed a successful cosmetic dipilatory compound as part of which the optimum of alkalinity, so as to avoid irritation to tender human skin, was very vital. Thereupon, being faced with the present suit, defendants, taking this disclosure and working backwards, so to speak, said, in effect, let us see whether, by using only substituted mercaptans, or better still, the *precise substituted* mercaptan which Evans and McDonough used (but which Turley, for all that is taught in his patent never used although he did mention it among many other mercaptans), we cannot produce by Turley's formula a compound which will be equivalent to that of Evans and McDonough. In this they were successful, but we believe they were successful only because they had the benefit of, and relied upon that which Evans and McDonough had discovered,—that you could produce a satisfactory cosmetic depilatory by the use of a substituted mercaptan, such as thioglycollic acid, with a critical pH limit.

Likewise, we believe that General Electric Co. v. Hoskins Mfg. Co., supra, supports our conclusion. There the patented device embraced an electric resistance element which was composed of an alloy consisting of one of the metals of the chromium group, and of a metal having the property of nickel and cobalt, combined in stated proportions "to provide as an improved electric resistance material, a metal which has the property of being particularly low in electrical conductivity, has a melting point exceeding that of pure copper, and may be drawn or otherwise shaped to form particularly durable, efficient, and desirable strips, strands or filaments suitable for use in various connections where electric resistances are desirable."

The defendant argued that the plaintiff's patent was anticipated by an English patent issued to one Placet. Placet's patent, which related to a method of introducing

pure chromium into metals and alloys in a state of fusion, claimed that his product "improves all metals and alloys with which it is mixed by imparting to them the qualities peculiar to itself. It renders them harder, more resistant to shock, tension, and friction, and also renders them more proof against the destructive action of the air, moisture, acids, and high temperatures." By reason of their resistance to high temperatures they are highly suitable for the manufacture of tuyeres, hearths, and firearms. *"Chromium increases the electrical resistance of manganese, ferro-manganese, ferro-nickel, and other metals employed in the manufacture of conductors* of high electrical resistance." (Emphasis supplied.)

The patent was held valid (and infringed), the Court stating (224 F. at pages 467–471): " * * * It will be seen from Placet's English patent that the patentee leaves it to others to ascertain by experiment products of chromium and metals in alloy suitable for high resistance and those disclosing the element of resistance to high temperatures. Placet's discoveries were before the public about 11 years before Marsh's patent was granted, from which fact it may be at least conjectured that the valuable resistance and duration properties as resistance elements, which appellant finds disclosed therein, were not ostentatiously in evidence. Now, the law is well settled that in order to anticipate a later invention, the prior description must be such as to show that the article described in the patent can be certainly arrived at by following the prior description without the assistance of local knowledge or local prior use in the locality where the description is published, and without experimentation.
* * * * * *

" * * * It was an inventive act on Marsh's part to extricate this most valuable material from the vague generalities and speculative statements of Placet, and place it among the instrumentalities of science as an electrical resistance element. Treibacher Chemische Werke, etc. v. Roessler & Hasslacher Chemical Co., 219 Fed. 210. Here is an element which has made commercially practicable the manufacture of a large line of electrical power using devices,

greatly contributing to the comfort of mankind as well as to the rewards of business enterprise. That Marsh was entitled to a patent for the service he rendered in rescuing the alloy from obscurity and placing it in the forefront of electrical resistance elements seems clear under the authorities. He first disclosed the properties and great advantages of the chromium-nickel alloy as a resistance element. So far as the record shows these had never been suggested in any manner calculated to lead to their application to the uses set out in the patent. Marsh substituted the alloy for the ineffective and practically discarded resistance elements of the prior art. The result was such a remarkable advance upon that prior art as to turn failure into unquestioned success."

Foremost among the decisions upon which defendants rely, as being opposed to the view which we take, is In re Thuau, supra, a fairly recent decision of the Court of Customs and Patent appeals, which was presented to and considered by the Patent Office Examiner during the proceedings that led up to the issuance of the Evans and McDonough patent.

In the Thuau case, the Court of Customs and Patent Appeals had before it an appeal from a decision of the Board of Appeals of the United States Patent Office affirming an examiner's decision rejecting certain claims of the appellant's application for a patent. The appellant claimed that his alleged invention related "to a therapeutic product for the treatment of diseased tissue, which product comprises a water soluble condensation product of meta-cresolsulfonic acid and an aldehyde, such as formaldehyde. This therapeutic product is especially useful in the treatment of cervicitis, cervical erosions, and related ailments." The appellants recognized that condensation products of a cresol with formaldehyde had been used as tanning agents, but argued that, although the composition he claimed in his invention had long been known, yet its only use had been for tanning purposes, and that he had invented a new and unobvious use for it, namely, as a therapeutic product for the treatment of diseased tissue.

In rejecting the appellant's claims to invention, the Court stated, (135 F.2d at page 346): "Appellant discovered that this old composition is useful for the treatment of diseased tissue. *He has in no way changed the composition* for such new use, and as stated the question before us is whether a new and unobvious use for an old composition, *without change in or addition to* that composition, is patentable." (Emphasis supplied).

Further, the court said (135 F.2d at page 347): "The doctrine is so familiar as not to require citation of authority that a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him. Likewise, with regard to an unpatentable article or substance long in use, any member of the public has the right to every use of which the article or substance is susceptible so long as it is unchanged in any way, regardless of whether or not such uses were known prior to his own use.

"To allow a patent for an old composition without change in any way, merely because it may be used for a specified purpose, would result in a situation where two compositions of exactly the same character could be sold by merchants to consumers, but if one of the compositions was not made by the patentee or his assignee or licensee, the merchants might be liable to suit for infringement if the composition was used by the purchaser for therapeutic purposes, and the user would certainly be liable to such a suit.

\*　　\*　　\*　　\*　　\*　　\*

"That appellant has made a valuable discovery in the new use of the composition here involved we have no doubt, and it is unfortunate for him if he cannot make claims adequate to protect such discovery, but to hold that every new use of an old composition may be the subject of a patent upon the composition would lead to endless confusion and go far to destroy the benefits of our patent laws."

Obviously, what Evans and McDonough did was quite different from what the patentee did in the Thuau case. They did much more than apply an old composition, without change, to a new use. They dis-covered that substituted mercaptans, particularly those of the polar groups, when combined with other elements in stipulated proportions, produced a depilatory that was commercially more satisfactory than any hitherto known. Turley taught that many mercaptans, some substituted, others not, would satisfy his need which was a totally different one. It remained for Evans and McDonough to discover that certain substituted mercaptans, and only those, would satisfy their need. They did much more than merely pick from Turley some of the mercaptans he mentions and then follow his teaching. They made, as a result of much experimentation, (1) a *new, and much more limited classification* of organic substances and then (2) applied them successfully to a different art, disclosing why these particular substances, and no others, met the requirements for success.

In the Thuau case, the Court rather summarily disposed of Gilbert Spruance Co. v. Ellis-Foster Co., and General Electric Co. v. Hoskins Mfg. Co., supra, as well as several other decisions in which a like result was reached, some of which we have referred to supra; and relied upon still other decisions which we do not consider sufficiently analogous on their facts to require analysis here.

We turn now to the remaining patent cited as an anticipation of Evans and McDonough, namely, French patent 824,804, issued November 18th, 1937, to William Fletcher. As we have previously stated, this patent embraces substantially the same subject matter as that covered by the application of Bohemen, filed in the United States Patent Office and over which, as a result of interference proceedings, Evans and McDonough secured priority by Bohemen withdrawing in favor of the former.

Plaintiff concedes that this French patent, *considered by itself,* independently of the testimony which plaintiff introduced with respect to the actual date when Evans and McDonough first discovered and successfully applied the formula embraced in their patent, clearly anticipates Evans and McDonough.

The French patent commences by stating that "The present invention concerns toilet

preparations, and more particularly depilatory preparations, its subject matter being the preparation of an agent for the removal of superfluous hair by means of chemicals that do not possess the odor of hydrogen sulfide." It is further stated that "with the present invention an improved depilatory preparation is obtained by combining a mercaptan carboxylic acid, one of its homologues, or the salt of the acid or the homologue, with an excess of alkali sufficient to give a product having a pH value not below 10." Various examples are set forth in the patent and in example 1 thioglycollic acid is specifically named. This example reads as follows and is substantially the same as the teaching of Evans and McDonough: "First a cream base is prepared by dispersing in 90 parts of hot water 10 parts of commercial stearic alcohol containing 10% of sulfonated stearic alcohol. This cream base is stirred until cool, and may be heated and allowed to cool if it is not smooth enough.

"When this smooth cream base is cold, 10 parts of calcium hydroxide is incorporated perfectly in 66 parts of the base. Then 4 parts of thioglycolic acid is gradually added and the temperature is prevented from rising above $60^{\circ}$ C. and is kept preferably below $50^{\circ}$ C. When all the thioglycolic acid has been added and the reaction has come to an end, 20 parts of precipitated chalk is added and incorporated perfectly. Finally, about one-fourth of a part of a compound of synthetic or natural perfume is added.

"The product which results has a pH value of between 12 and 13, and removes the hair in from 5 to 10 minutes according to the texture of the hair."

The Resume of the patent states that "The invention concerns a process of manufacturing a depilatory preparation and its characteristic feature is the mixture of mercaptan carboxylic acid or one of its homologues or a salt of said acid or said homologue, with an excess of alkali sufficient to form a product having a pH value not lower than 10. The invention is moreover characterized by the following points, taken together or separately." The "points" referred to in the aforegoing correspond to claims in an American patent. The second "point" in the French patent reads as follows: "2 to 4% of thioglycolic acid is mixed with 5 to 10% of calcium hydroxide in an appropriate medium containing water, the product obtained having a pH value between 12 and 13."

The only difference that may be said to exist between Fletcher and Evans and McDonough is that the upper pH limit is greater in Fletcher, namely "between 12 and 13" as opposed to about 12.5. However, we feel that it is unnecessary to dwell more analytically upon Fletcher because we believe that the testimony introduced on behalf of the plaintiff must be accepted as clearly establishing the fact that Evans and McDonough did actually make their discovery as early as March 11, 1937, and therefore, that they were not anticipated by Fletcher, the earliest date which, as conceded, may be applied to Fletcher being November 18, 1937.

Plaintiff's testimony to which we refer, and which we are satisfied has not been successfully overcome by defendants, is not merely verbal testimony but is embraced in the contemporaneous written laboratory notes of McDonough's research assistant. These notes show that as early as March 11, 1937, McDonough was conducting experiments with the same formula ultimately covered by his patent, including the use of thioglycollic acid as the substituted mercaptan. These notes show that beginning with a pH of 8.1, there was no depilating action inside of 15 minutes, that there was partial depilating action in 10 minutes with a pH of 9, and complete, satisfactory depilation in 10 minutes with a pH of 9.65 and 11.8, beyond which no experimentation with regard to irritation of the skin was conducted, although the notes show that the formula was completely carried out until a pH of 12.25 was reached. The notes show that this figure was changed to 12.5 on March 15. These results are confirmed by what is designated as "Revised Data" written in the notebook by McDonough's same research assistant under date of March 18, 1937, except that the highest pH entry that appears is 12.25.

It has been urged by counsel for plaintiff that an even earlier date, namely, February 14, 1936, should be taken as the Evans and McDonough conception of their invention because of evidence introduced in the form of McDonough's own laboratory notebook data, showing that at that time he made similar experiments with successful depilation in 10 minutes. However, there is no convincing evidence, either written or oral, that at this earlier time, either Evans or McDonough actually discovered what was the optimum of alkalinity for depilation purposes.

Our patent law provides that one may obtain a patent "who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, * * * not known or used by others in this country, *before his invention or discovery thereof,* and not patented or described in any printed publication in this or any foreign country, *before his invention or discovery thereof,* or more than one year [two years as the law stood when applicable to Evans and McDonough] prior to his application, and not in public use or on sale in this country for more than one year [formerly two years] prior to his application, unless the same is proved to have been abandoned, * * *." (Emphasis supplied.) R.S. Sec. 4886, 35 U.S.C.A. § 31.

■ It will thus be seen that in order to invalidate a patent by anticipation it is not sufficient to show merely that what was patented was used or patented or a description of it was published, as specified, prior to application for the patent, but it must be shown that such occurred prior to the patentee's actual discovery or invention.

Parenthetically, it may here be noted that Bohemen's filing date was July 24, 1937. However, this date can be of no avail to the defendants in the present case because a patent never issued to Bohemen. See Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

In an effort to overcome the testimony of plaintiff which we have just analyzed, defendants assert that the laboratory notes of the experiments made in March, 1937, by McDonough's research assistant failed to indicate that at that time McDonough had discovered what was in fact the critical upper pH limit, because the notes indicate that experimentation as to any irritation being produced upon the skin was halted at 11.8, and that when questioned as to why he did not proceed further, McDonough's research assistant merely testified that this was unnecessary because it was already established to their satisfaction that a pH of 12.5 was the extreme upper limit. From this, defendants would have us conclude that since McDonough subsequently in his patent adopted 12.5 as the crucial upper pH limit, he cannot be said to have discovered anything in this regard in March, 1937, when he stopped his experimentation at 11.8. However, we are not impressed with this argument. First, it is not accurate to say that the claims in suit fix 12.5 *absolutely* as the maximum pH. They all merely provide that such limit shall be "about 12.5". Second, this argument over-emphasizes the pH optimum of alkalinity, as and of itself, and fails to give due emphasis to the fact that we are here dealing with a combination of elements. Thus, we are satisfied that in March, 1937, as disclosed by McDonough's laboratory notebook, he did, as a result of extensive experimentation, discover *at that time* an effective depilatory, compounded as he subsequently described it, in the claims of his patent now before us.

■ Defendants also assert that this notebook evidence should not be accepted as conclusive because corroboration of it by other witnesses is lacking, but we, likewise, are not impressed with this argument. We have not merely verbal testimony but the actual written, contemporaneous notes, which we are satisfied by themselves fully meet the requirement that proof of actual invention, prior to the application date of the patent, must be complete and convincing. Furthermore, McDonough did, in fact, corroborate, in his deposition testimony, the very details of the notebook entries.

While the Fletcher patent was cited to the Patent Office when the application of Evans and McDonough was pending, it does not appear that the Patent Office gave it any

consideration, or that the laboratory notebook evidence, just analyzed, was ever disclosed to the Patent Office.

We are, of course, mindful of the well established rule that while, as between two inventors, priority of invention will be awarded to the one who, by satisfactory proof, can show that he first conceived the invention, nevertheless, in order to obtain the benefit of this prior conception, the inventor must not abandon his invention, but must proceed with diligence to reduce it to practice. Marconi Wireless Tel. Co. v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731, rehearing denied, 320 U.S. 809, 64 S.Ct. 25, 88 L.Ed. 489. It is clear that this requirement has been amply met in the present case. The plaintiff, as assignee of Evans and McDonough, was profitably marketing IMRA made under the patent, in 1939, that is, within two years of Evans and McDonough's first conception of their formula, and within a year after their patent application.

There remains to be considered in connection with the prior art, only the article by Henry B. Merrill entitled "Effect of Sulfides on the Alkaline Hydrolysis of Skin and Hair", published in September, 1924. As to this, suffice it to say it can in no sense be treated as a prior disclosure of Evans and McDonough for the reason that Merrill confines his discussion exclusively to sulfides. There is no suggestion of mercaptans in his article and the entire experimentation with which he concerns himself was confined to animal hair and skin. It is true that Merrill discloses the nature of the unhairing process, namely, that it is a two-step process, the first step being the reaction between keratin and a sulfide, and the second being the hydrolysis of the altered keratin by the hydroxide, and it is further true that there is likewise a two-step process in the depilation taught by Evans and McDonough. But the distinction lies in the fact that Evans and McDonough discarded sulfides in the first reaction step and substituted therefor an entirely different substance, namely, an organic compound.

To summarize our conclusion with respect to the prior art: no single patent or publication anticipates the patent in suit. Furthermore, the patent in suit cannot be said to be anticipated by the successive stages disclosed, in the advance of the depilatory art, by any of these prior patents or publications when they are read together as successive steps in the art.

### (c) Commercial Success.

It is a well established principle of patent law that marked commercial success is a factor entitled to weight in determining whether there has been invention, and that it should in a close case tip the scales in favor of patentability. Goodyear Tire & Rubber Co. v. Ray-O-Vac, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Dow Chemical Co. v. Halliburton Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed 973. Thus, even if the present patent be treated as a close one on the question of validity, the commercial success which has attended the marketing of IMRA made in accordance with the patent, requires a holding that the patent is valid.

The uncontradicted testimony in the case discloses that gross sales of IMRA to the plaintiff's distributors doubled in the six years that have followed the commencement of its manufacture, reaching more than $250,000 in 1946, and a total of more than $1,250,000 for the entire period. Also, it is significant that the ratio of complaints from purchasers of IMRA was never large and that in 1946, the number was negligible. Also, IMRA enjoys the most favorable product liability insurance rates granted its competitors. In short, it has been definitely proved that IMRA caters, with increasing success, to a new and somewhat more fastidious market,—to those who had refused to buy the sulfide depilatories.

### Infringement.

Little need be said with respect to infringement. This is true, first, because on behalf of both defendants it is virtually conceded that if the claims in suit are valid, they are infringed by both SLEEK and NAIR, the products dispensed by Hutzler Brothers Co. and Carter Products, Inc., respectively; and second, because apart from such concession, the uncontradicted testimony of plaintiff shows conclusively that

all of the elements and characteristics of both of the defendant compounds, including their pH, are embraced in claims 2, 11, 12 and 13.

Plaintiff's chemist gave a detailed analysis based on his own laboratory tests of SLEEK and NAIR, compared the results with the requirements of all of the claims in suit and found virtual identity in all respects. This testimony is clear and entirely convincing.

### Conclusions.

For the reasons herein given, claims nos. 6 and 17 of the Evans and McDonough patent are found to be invalid, but the remaining four claims in suit, namely, nos. 2, 11, 12 and 13, are found to be valid and infringed by the two products of the defendants. Accordingly, an appropriate decree will be signed, giving the plaintiff injunctive relief, and referring the case to a special master for the purpose of determining the amount of profits and damages to which the plaintiff may be entitled.